**UNITED STATES of America,**
**Plaintiff,**

v.

**W. F. MORGAN & SONS, a partnership,**
**and Cranston Morgan, and Raymond**
**F. Morgan, individuals, Defendants.**

**Civ. A. 2458-M.**

United States District Court
E. D. Virginia,
Richmond Division.

Nov. 26, 1957.

Findings of fact and conclusions of law. See also 155 F.Supp. 40.

HUTCHESON, Chief Judge.

This cause came on for hearing upon the plaintiff's complaint for a permanent injunction. The Court examined the pleadings and heard the testimony and argument for both parties. Upon the basis of the admissions in the pleadings and testimony and exhibits presented, the Court hereby makes the following findings of fact and conclusions of law:

Findings of Fact

1. Defendant W. F. Morgan & Sons is a partnership trading and doing business at Weems, Virginia.

2. Defendant Cranston Morgan is an active partner in the said partnership, residing at White Stone, Virginia, and is presently in charge of the oyster packing operations of said partnership.

3. Defendant Raymond F. Morgan is the other active partner in said partnership, residing at White Stone, Virginia, and is actively engaged in the business conducted by the said partnership, being principally in charge of the fish business thereof.

4. Prior to October 25, 1953, W. F. Morgan & Sons was managed by Wilbur F. Morgan, the father of Cranston and Raymond F. Morgan, and the founder of the business. The said business had been operated for many years as the sole proprietorship of the said Wilbur F. Morgan, and for approximately a year and a half immediately prior to October 25, 1953, under an operating agreement with Cranston Morgan and Raymond F. Morgan. It is unnecessary to decide whether or not the said operating agreement resulted in the formation of a partnership, since it is found that management and control remained in Wilbur F. Morgan.

5. After the death of their father, on October 25, 1953, Cranston Morgan and Raymond F. Morgan assumed active management and full operating control of the business of W. F. Morgan & Sons.

6. The defendants have been and are now engaged in the business of processing, preparing, and packing into double seamed and friction top cans, and selling and distributing in interstate commerce, raw oysters, articles of food within the meaning of the Federal Food, Drug, and Cosmetic Act.

7. There is a definition and standard of identity for raw oysters, 21 C.F.R. 36.10, promulgated under 21 U.S.C.A. § 341. This definition and standard of identity provides, inter alia, that oysters prepared and packed in the manner employed by the defendants shall be drained so that they do not contain more than 5% free liquid by weight when tested within 15 minutes after packing. 21 C.F.R. 36.10(c)(2)(ii). It also provides that raw oysters prepared in the manner employed by the defendants shall not remain in contact with fresh water more than 30 minutes after shucking. 21 C.F.R. 36.10(b).

8. Plaintiff introduced no satisfactory proof that defendants' oysters introduced into interstate commerce contained more than 5% free liquid within 15 minutes after packing, as specifically provided by the regulations establishing definitions and standards of identity for raw oysters, and did not charge or prove that these regulations had been violated by the defendants under 21 U.S.C.A. § 343(g).

9. The complaint charges that the oysters are adulterated under 21 U.S.C.A. § 342(b)(2) and (b)(4) by reason of the presence of added water. To prove adulteration under these sections,

plaintiff relied on the proposition that oysters do not "bleed" after packing— that is, that oysters, if properly packed according to the definition and standard of identity so that there is no more than 5% free liquid within 15 minutes after packing, will not at anytime thereafter have more than 5% free liquid. This was plaintiff's contention although the Findings of Fact made by the Federal Security Administrator in establishing the definition and standard of identity for oysters, 11 Fed.Reg. 9333, declared that "All oysters exude some liquid after removal from the shell...If oysters are washed, drained, and packed while still bleeding, liquid will appear in the container in which packed giving the appearance of inadequate drainage." Plaintiff's present contention is that when oysters are tested at any period after 15 minutes after packing and found to contain in excess of 5% free liquid, the excess was present within 15 minutes after packing.

10. According to Government witness Hoshall, "There has long been a difference of opinion as to whether or not oysters from the Chesapeake Bay (those which we particularly deal with) do bleed." The evidence offered by the Government in support of the contention that oysters do not "bleed" after packing consisted principally of the results of two tests. First, Food and Drug Inspectors prepared 182 packs of oysters at commercial plants and determined the free liquid content within fifteen minutes of packing and at different time intervals subsequent to packing. However, the specific results of these determinations were not introduced into evidence. Second, under the supervision of Food and Drug Administration officials Daughters and Hoshall, seven lots of oysters taken from the Chesapeake Bay in November 1951, were prepared according to the regulations, shipped to four districts of the Food and Drug Administration to simulate conditions under which commercial packs would be shipped, and analyzed over a period of from 1 to 19 days from the day of packing. The packs on both experiments were put up under the method referred to in 21 C.F.R. 36.10(c)(2)(i), not 21 C.F.R. 36.10(c) (2) (ii), the method used by most commercial plants including defendants. On the basis of these experiments, the Government's conclusion was that Chesapeake Bay oysters do not gain in free liquid after 15 minutes after packing.

11. The defendants, on the other hand, presented qualified experts with experience in handling and analyzing Chesapeake Bay oysters, who testified that some Chesapeake Bay oysters do exude liquid after being packed. The evidence was that bleeding will occur to varying degrees according to the temperature at which they are packed, the amount of agitation to which they are subjected, such as in shipping, the temperature at which they are stored, the season of the year and the month in which oysters are taken, the geographical location of the oysters, there being a North-South gradation as to fragility and extent of bleeding, and the condition of the living oyster prior to shucking and packing. For example, Dr. Dayton Carritt, Ph.D. in analytical chemistry from Harvard and now an Associate Professor of Oceanography at Johns Hopkins University, a witness with impressive qualifications and background, testified with respect to the behavior of oysters he had tested. He prepared an authentic pack of oysters containing 1% free liquid which was put in quiescent storage at 34 degrees and 41 degrees F., examined them at intervals up to 8 days, and found that those stored at 34 degrees went from 1 to 3% in 8 days, those stored at 41 degrees from 1% to 9% in 8 days. It appears that temperature of storage is an important factor, and that some oysters legally packed have increased in free liquor content up to 2% in 8 days if stored at 34 degrees, and up to 8% if stored at 41 degrees. Dr. Carritt also performed an experiment on oysters stored, with less than 2% free liquid, under simulated shipping conditions—that is, by putting oysters on a

rocking machine—and determined that the free liquor content rose to 5% in less than 2 hours. While Dr. Carritt's tests were admittedly performed on a small quantity of oysters, the results obtained by him, and the testimony of other witnesses, are sufficient to indicate that some Chesapeake Bay oysters do bleed, thus casting doubt upon the validity of the Government's generalization upon which its entire case was based that Chesapeake Bay oysters do not "bleed" after packing.

12. There was, in addition, testimony from well-qualified and experienced witnesses in the field, including a representative of the United States Fish and Wildlife Service, that the directions in the regulations for testing oysters for free liquid content are imprecise, so that different results can be obtained by different testers on the same material depending upon the manner in which oysters are placed on the skimmer, the way in which they are handled or distributed on the skimmer, the way in which they are agitated during the period of draining, and the way in which they are removed from the skimmer. Dr. Carritt pointed out, in testimony which was not contradicted, that since in the Daughters and Hoshall experiment referred to in Finding 10 the material tested was homogenous and the testing procedure of the Food and Drug collaborating laboratories was presumably the same, the averages of the laboratories, which did the same number of analyses should be the same. Dr. Carritt said that though the averages all were below 5% free liquid, the range of free liquid content varied as much as 87%, so that, even with homogenous material obtained by the Government and tested in its own laboratories according to the method prescribed in the regulations, the determination of free liquid can vary according to which laboratory or tester performs the test.

13. According to the 1946 Findings of Fact leading to the issuance of the definition and standard of identity for oysters, when shucked oysters are placed in contact with fresh water in the wash-ing process, known as blowing and soaking, there is absorption of water by the oysters, and there is no known formula by which the amount of absorption can be determined. The Government contended at the trial, however, that a test for total solids will reveal whether oysters have been in contact with water for more than the 30 minutes prescribed by the regulations, 21 C.F.R. 36.10(b), and that the minimum figure for total solids is 10.4%, though the regulation prescribes neither the test nor the minimum. The evidence, including the variation in solids content of oysters in their natural state, does not support the Government's contention, and the court finds that the total solids test performed on the oysters after packing does not provide satisfactory proof as to whether or not the oysters have been in contact with fresh water for more than the time prescribed in the regulations.

14. The evidence of the Government is that on five occasions prior to the change in management in October of 1953, shipments of oysters produced by W. F. Morgan & Sons, predecessors to the defendant firm, were seized by the Government upon the grounds that they contained excess free liquid. The tests for the excess free liquid were admittedly made some days after packing, and not within 15 minutes after packing, as provided by the regulations. The proceedings in these seizures were not contested, and decrees of condemnation were entered.

15. Early in November 1953, a truckload of raw oysters was shipped by the defendant partnership in interstate commerce, portions of which went to various destinations outside the State of Virginia. The shipments contained in the said truckload were seized by the Government upon a charge of being short in volume. No charge was made as to free liquid content as to these oysters. These cans were the first to be filled by the new filling machine just purchased by the defendant firm, they were produced during a period when both the individual defendants, the general partners in the

defendant partnership, who had just acquired control of the business upon the death of their father, Wilbur F. Morgan, were absent from the business in connection with the funeral of their father, on the eastern shore of Maryland, and the illness of their mother, who had suffered a heart attack following the death of her husband. The new filling machine was then checked by its manufacturer, found to be defectively adjusted, and was repaired. Since that time, there have been no seizures of oysters produced by the defendants based on the charge of short volume.

16. One truckload of the defendants' oysters, containing shipments to various points outside the State of Virginia, was seized by the Government on the ground that the cans of oysters tested from the said shipment, the tests being made some days after packing, when tested, contained more than 5% of free liquid. This seizure occurred in the autumn of 1956, and is the only charge of adulteration which was made by the Government against the defendants after the change in management of the defendant business and prior to the institution of this case. The seizure was not contested.

17. There was testimony from Food and Drug Inspectors that, when factory inspections of defendant's plant were made in 1949 and 1951, they observed that some oysters had been held in contact with water for more than the 30 minutes prescribed by the regulations. This evidence is contradicted by the evidence of the defendants, and there is no evidence of any such practice after the change in management, control and ownership of the defendants' business in October 1953. During those inspections, as well as during one made in 1956, inspectors took samples and made tests for free liquid determinations, some of which showed free liquid in excess of 5%. Almost all of these tests were made after, rather than within, 15 minutes after packing.

18. While a difference of opinion exists between reputable scientific witnesses for the Government and the defendants as to the bleeding characteristics of Chesapeake Bay oysters, as outlined in Findings 10 and 11, the Court finds that some Chesapeake Bay oysters do increase in free liquid content after packing. There is no substantial evidence that any oysters introduced into interstate commerce by the defendants, when tested for free liquid content as the plaintiff's regulations specifically prescribe within fifteen minutes after packing, contained in excess of the five percent free liquid by weight allowed by the regulations. In the light of Findings of Fact 10 and 11 above, the plaintiff's evidence that defendants' oysters, when tested some days after packing, in some cases contained in excess of five percent free liquid, does not constitute satisfactory proof that the same oysters, had they been tested within fifteen minutes after packing as provided by the regulations, would have contained more than the allowable five percent free liquid. In addition, where there are differences in the results of tests of free liquid content on the same material, they may appear because of differences in the method of handling the oysters during testing.

19. Moreover, since an injunction looks to the future, the seizures and the factory inspection evidence are not the sole factors bearing on the court's exercise of discretion. They must be considered in the light of defendants' present attitude and practices in order to determine whether an injunction is necessary to compel compliance with the Act. Defendants have taken several affirmative steps to insure compliance with the Act. Approximately coincident with the change of management of the defendant business, mentioned above, new blowing and soaking equipment, a new skimmer for draining oysters, and a new filling machine for filling cans with oysters were procured. In 1956, prior to the commencement of this action, the defendant partnership retained the services of Froehling and Robertson, Inc., a reputable firm of analytical chemists in Richmond, Virginia, to make regular tests for free liquid of the oysters produced by the

defendants and being introduced into interstate commerce. This chemical testing firm is still performing this service for the defendant partnership and will continue to do so. Very shortly after the change in management of the defendant business, late in 1953, acting on the advice of an inspector of the Food and Drug Administration, the individual defendant, Cranston Morgan, instituted, and has continued, a system of making tests for free liquid in oysters which, while not of laboratory precision, yields dependable information as to whether or not there is a significant excess of free liquid. The defendant partnership also became a member of the Oyster Institute of North America, a national association of the oyster industry which has for one of its purposes the improvement of the pack of its members. Upon the basis of these facts, the Court finds that the evidence does not establish that there is a likelihood that the practices complained of will continue.

### Conclusions of Law

1. This Court has jurisdiction over the parties and subject matter of this action under the provisions of 21 U.S.C.A. § 332(a) and is authorized by that Section to restrain violations of 21 U.S.C.A. § 331(a).

2. Since an injunction looks to the future, the practical steps which defendants have taken, particularly since the change in management in 1953, to insure compliance with law, should be taken into account. Upon consideration of these circumstances, and of all the testimony, the Court concludes the evidence did not establish a likelihood that the defendants will violate the law in the future.

3. There has been one seizure based upon a shortage of volume of cans of oysters produced by the defendant firm, but, in view of the corrective measures taken by the defendants, the court concludes that no likelihood of future violations of this nature has been established.

4. Plaintiff has failed to establish, by a preponderance of the evidence, that the results of tests on free liquid and total solids upon which its case rests prove violations under 21 U.S.C.A. § 342(b)(2) and (b)(4). There is such difference of opinion among scientific witnesses for the plaintiff and scientific witnesses for the defendant with respect to these fundamental issues that there is insufficient evidence to support the government's conclusion that oysters do not bleed. The weight of the evidence indicates that oysters in question do under certain conditions bleed. It follows that the plaintiff has not shown by the greater weight of the evidence, which is the test, that the shipments in question contained an excess of free liquids fifteen minutes after packing.

5. For the foregoing reasons, and since the grant of a statutory injunction rests in the sound discretion of the court (Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754), this court concludes that the plaintiff has not established that the circumstances require the issuance of an injunction as prayed for in the complaint.